1  William R. Terpening, Esq. (NC Bar No. 36418)
   TERPENING LAW PLLC
2  5950 Fairview Road, Suite 808
   Charlotte, North Carolina 28210
3  Email: terpening@terpeninglaw.com
4  Phone: (980) 265-1700
   Fax: (980) 265-1729
5
6  Jeff Mitchell, Esq. (CA Bar No. 188751)
   MITCHELL LEEDS, LLP
7  555 California St, Ste 4925
   San Francisco, CA 94104
8  Email: jeff@mitchelllawsf.com
   Phone: (415) 659-1555
9  Fax: (415) 276-9099

10 Attorneys for Plaintiff

**FILED**

DEC 0 4 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

**SEALED**

11

12

13

14

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

15  UNITED STATES ex rel.
16  MICHAEL TERPENING,
17         Plaintiff,
18     v.
19  FRESNO COMMUNITY HOSPITAL
    AND MEDICAL CENTER; PHYSICIAN
20  NETWORK ADVANTAGE, INC.;
    SANTE HEALTH SYSTEM, INC.;
21  SANTE HEALTH FOUNDATION; BERJ
    APKARIAN; CRAIG CASTRO;
22  CENTRAL CALIFORNIA FACULTY
    MEDICAL GROUP; TIMOTHY JOSLIN;
23  MICHAEL MARUYAMA; GRANT
    NAKAMURA; PATRICK RAFFERTY;
24  CHRISTOPHER ROGGENSTEIN; and
    MICHAEL SYNN;
25
           Defendants.
26

27

28

No. 1:19-CV-01699-LJO-SAB

**QUI TAM COMPLAINT**

**(Filed Under Seal)**

**(Jury Trial Demanded)**

1

The United States of America, by and through *qui tam* Relator, Michael Terpening ("Mr. Michael Terpening"), brings this action under 31 U.S.C. § 3729, *et seq.,* as amended ("False Claims Act") to recover from Fresno Community Hospital and Medical Center, and its executives, physicians, subsidiaries and partners, all damages, penalties, and other remedies available under the False Claims Act on behalf of the United States.

**INTRODUCTION**

1.    This is an action to recover damages and civil penalties on behalf of the United States of America, for violations of the federal False Claims Act; the Medicare and Medicaid Anti-Kickback Statute; 42 U.S.C. §§ 1320a-7a and 1320a-7b (the "Anti-Kickback Statute"); and the Stark Law, 42 U.S.C. § 1395nn.

2.    This case arises from the Defendants' unlawful participation in a widespread kickback and remunerations scheme orchestrated by Defendant Fresno Community Hospital and Medical Center and operated through Defendant Physician Network Advantage Inc., Defendant Santé Health Systems and Defendant Santé Health Foundation.

3.    From as early as 2011, Defendant Fresno Community Hospital and Medical Center has provided compensation in the form of cash, expensive wine, cigars, strip-clubs, trips with private planes and more, to Fresno-area physicians and medical practices in exchange for referrals to their facilities and for use of their electronic health record system and network. Fresno Community Hospital and Medical Center has disguised these payments through Defendant Physician Network Advantage, Inc., Defendant Santé Health Systems and Defendant Santé Health Foundation.

4.    Knowingly and willfully violating the Anti-Kickback Statute and the Stark Law, Defendants have submitted and continue to submit claims for reimbursement for federal health programs such as Medicare and Medicaid. As a result, the United States has reimbursed Defendants for millions of dollars of false claims.

2

1    5.    The information provided by Relator Mr. Michael Terpening has neither been

2  previously disclosed nor made available to the public. Mr. Michael Terpening became aware of

3  these transactions after a 2017 fire at Defendant PNA's headquarters revealed a surplus of

4  expensive wine being held for Defendant CMC. Upon this discovery, Mr. Michael Terpening began

5  investigating financial documents available to him in his role as a Controller for Defendant PNA.

6    6.    Relator, Mr. Michael Terpening, seeks civil penalties, damages, declaratory relief,

7  injunctive relief and such other relief as available under the federal False Claims Act, and demands

8  a trial by jury for all claims for which the right to a jury trial is authorized on behalf of himself and

9  the United States.

10  **PARTIES, VENUE, AND JURISDICTION**

11    7.    Relator, Mr. Michael Terpening, is an individual and citizen of the United States of

12  America residing in the Central District of California. Mr. Michael Terpening is a Certified Public

13  Accountant who served as a Controller for Physician Network Advantage Inc. ("PNA") between

14  2011 and December 2017.

15    8.    Defendant, Fresno Community Hospital and Medical Center, DBA Community

16  Regional Medical Center ("CMC"), is a California domestic non-profit that has its principal place

17  of business at 789 Medical Center Drive East, Suite 101, Clovis CA 93611 and can be served

18  through its Registered Agent: Brianne L. Marriott, 789 Medical Center Drive East, Suite 101,

19  Clovis CA 93611. CMC operates the following hospitals and outpatient healthcare facilities:

20    a)  Clovis Community Medical Center located at 2755 Herndon Ave, Clovis, CA

21    93611;

22    b)  Community Regional Medical Center located at 2823 Fresno St, Fresno, CA

23    93721;

24    c)  Fresno Heart & Surgical Hospital located at 15 E Audubon Dr, Fresno, CA

25    93720;

26    d)  Community Behavioral Health Center located at 7171 N Cedar Ave, Fresno, CA

27    93720;

28    e)  Advanced Medical Imaging located at 6297 N Fresno St, Fresno, CA 93710;

f)  California Cancer Center located at 7257 N Fresno St, Fresno, CA 93720;

g)  Community Cancer Institute located at 785 North Medical Center Drive West, Clovis, CA 93611;

h)  Deran Koligian Ambulatory Care Center located at 290 N. Wayte Lane, Fresno, CA 93701; and

i)  Community Subacute & Transitional Care Center located at 3003 N. Mariposa St., Fresno, CA 93703.

9.    Defendant Physician Network Advantage, Inc. ("PNA") is a California, for-profit corporation that has its principal place of business at 7255 N First St. Ste 106, Fresno, CA 93720 and can be served through its Registered Agent: Christopher Roggenstein, 7255 N First St. Ste 106, Fresno, CA 93720.

10.    Defendant Santé Health System, Inc. ("Santé Health") is a California, for-profit corporation that has its principal place of business at 7370 N. Palm Avenue, Ste 101, Fresno CA 93711 and can be served through its Registered Agent: Scott B. Wells, 7370 N. Palm Avenue, Ste 101, Fresno, CA 93711. Santé Health is a partner of Defendant CMC.

11.    Defendant Santé Health Foundation ("Santé Foundation") is a California, non-profit foundation that has its principal place of business at 7370 N. Palm Avenue, Ste 101, Fresno CA 93711 and can be served through its Registered Agent: Scott B. Wells, 7370 N. Palm Avenue, Ste 101, Fresno, CA 93711. Santé Foundation is a network of Santé affiliated physicians and partner of Defendant CMC.

12.    Upon information and belief, Defendant Timothy Joslin ("Mr. Joslin") is a resident of California and citizen of the United States. Mr. Joslin is the President and CEO of Defendant CMC.

13.    Upon information and belief, Defendant Christopher Roggenstein ("Mr. Roggenstein") is a resident of California and citizen of the United States. He is the sole shareholder and officer of Defendant PNA.

14.    Upon information and belief, Defendant Craig Castro ("Mr. Castro") is a resident of California and citizen of the United States. Mr. Castro is the Chief Operating Officer of CMC.

15.    Defendant Central California Faculty Medical Group ("CCFMG") is a California organization with its principal place of business at 2625 E. Divisadero Street, Fresno CA 93721. CCFMG is a member of CMC's network group.

16.    Upon information and belief, Defendant Michael Maruyama, M.D. ("Dr. Maruyama") is a resident of California and citizen of the United States. Dr. Maruyama is a founding member of Valley Surgical Specialists, a member of the CMC Epic Network. Dr. Maruyama worked as an on-call surgeon for CMC as well as a physician advisor for PNA.

17.    Upon information and belief, Defendant Berj Akparian ("Mr. Akparian") is a resident of California and citizen of the United States. Mr. Akparian serves as the Vice President of Physician & International Health Relations for Defendant CMC. During the relevant time period, Mr. Akparian worked for Santé Health and Santé Foundation.

18.    Upon information and belief, Defendant Patrick Rafferty ("Mr. Rafferty") is a resident of California and citizen of the United States. During the relevant time period, Mr. Rafferty served as the Chief Operating Officer for CMC.

19.    Upon information and belief, Defendant Michael Synn M.D. ("Dr. Synn") is a resident of California and citizen of the United States. Dr. Synn is the Director of the Women's Specialty & Fertility Center as well as a member of Defendant CMC's board of trustees.

20.    Upon information and belief, Defendant Grant J. Nakamura M.D. ("Dr. Nakamura") is a resident of California and citizen of the United States. Dr. Nakamura is a member of Community Medical Providers.

21.    This Court has original federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Relator's claim presents substantial, disputed questions of federal law arising under the federal False Claims Act; the Medicare and Medicaid Anti-Kickback Statute; 42 U.S.C. §§ 1320a-7a and 1320a-7b (the "Anti-Kickback Statute"); and the Stark Law, 42 U.S.C. § 1395nn.

22.    This Court has subject matter and personal jurisdiction over all parties.

23.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732 because it is the judicial district in which all parties reside and the Defendants transact

1  business, as well as the judicial district in which the events and omissions giving rise to these claims

2  occurred.

3       24.     The facts and circumstances of the Defendants' violations of the federal False

4  Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in

5  any congressional, administrative, or General Accounting Office or Auditor General's report,

6  hearing audit, or investigation, or in the news media.

7       25.     Relator, Mr. Michael Terpening, is the original source of the information upon

8  which this Complaint is based, as that phrase is used in the federal False Claims Act.

9                                **FACTUAL ALLEGATIONS**

10       26.     Relator, Mr. Michael Terpening, is an accountant that has been practicing in Central

11  Valley, CA for over 30 years and has been a Certified Public Accountant for 17 years. He has

12  worked extensively with both individuals and corporations across multiple industries, recognizing

13  and solving complex accounting and tax issues.

14       27.     Defendant, CMC, is the largest healthcare provider and private employer in Fresno,

15  California. In 2018, CMC earned $1.67 billion in revenue, a portion of which results from CMC's

16  participation in federal healthcare programs, such as Medicare and Medicaid.

17       28.     Upon information and belief, Defendant CMC has and continues to submit claims

18  for reimbursement of federal healthcare programs, such as Medicare and Medicaid, certifying that

19  they are in compliance with Stark Law and the Anti-Kickback Statute. Compliance with these laws

20  is a material condition of payment under these programs.

21       29.     In or around 2010, Defendant CMC embarked on a seven-year, $75 million quality

22  improvement initiative to replace their business and clinical data systems with new technology, the

23  Epic electronic health record ("Epic EHR").

24       30.     Epic EHR is a comprehensive health record system that allows CMC and its

25  hospitals to connect their facilities with a vast network of physicians, medical practices, and patients

26  in the Fresno-area.

27

28

31.    Once they become members of CMC's Epic EHR Network, Fresno-area practitioners are connected and able to provide direct referrals to CMC's network of services, including laboratories, imaging centers, and other facilities.

32.    CMC's Epic EHR Network is a closed network that does not include or make referrals to any hospitals or providers outside of the CMC owned and operated facilities.

33.    Defendant PNA was formed in 2010 for the sole purpose and business function of expanding Defendant CMC's Epic EHR Network of Fresno-area medical practices. This initiative was known as Epic's Community Connect Program. PNA's owner, Defendant Mr. Roggenstein, did not make any capital investments or contribute any amounts to form the company. All of the startup funding used to create PNA was provided by Defendant CMC.

34.    Defendant, Mr. Roggenstein, is a longtime friend of Defendant Mr. Castro, who served and continues to serve as the Executive Vice President and Chief Operating Officer of CMC. Defendant Mr. Castro designed the logo that Defendant PNA used at its inception and continues to use to this day.

35.    In October of 2010, Mr. Michael Terpening began working as a consultant for Defendant PNA preparing budget models. From 2011 through 2017, Mr. Michael Terpening served as a Controller for PNA. In this position, Mr. Michael Terpening was responsible for PNA's internal bookkeeping which included reviewing financial reports, budgets and expenses. Specifically, Mr. Michael Terpening was able to review all transactions and payments made through and by PNA.

36.    To solicit physicians and practices to join the network, Defendant PNA contacted individuals directly to sell Defendant CMC's Epic EHR system. Along with installation, PNA would contract to train the users and provide support for their continued use of the system.

37.    Defendant PNA needed approval by Defendant CMC for all customers and engagements that they solicited to join the Epic EHR system. Defendant CMC would instruct Defendant PNA which physicians to contact and would approve or deny any others that had asked to join the exclusive network.

38.    Initially, the Epic licenses were purchased by Defendant CMC. Physicians and practices would pay PNA directly a one-time per physician fee as well as a monthly fee for

7

1    maintenance and support of the Epic EHR system. Then, Defendant PNA returned all money

2    received from Physicians' sites to CMC in the form of "licensing fees" back to CMC.

3        39.    From 2011 through 2014, Defendant CMC reimbursed Defendant PNA for any and

4    all costs and expenses incurred by PNA. Because of this arrangement, Defendant PNA's

5    management and staff compensation limits were established by Defendant CMC compensation

6    levels. Any annual increases or budget increases were also determined by Defendant CMC's rates

7    and policies.

8        40.    In or around 2014 and 2015, Defendants CMC and PNA changed their billing model

9    so that PNA could retain some of the moneys received from the physician groups. Because all

10    expenses were also being reimbursed by Defendant CMC, Defendant PNA was able to retain a cash

11    surplus from the Epic EHR client fees. PNA began to use the excess cash for extravagant gifts and

12    travel for CMC executives and CMC Network Physicians.

13        41.    Examples of the excess cash purchases included among other things:

14            a) In September of 2014, Defendant PNA paid for a trip to Paris, France for

15               Defendant Mr. Castro and his family totaling approximately $63,000.

16            b) Defendant PNA rented a private plane for Defendant Mr. Joslin to go to Las

17               Vegas, Nevada.

18            c) In January of 2016, Defendant PNA paid for strip clubs and meals for Defendant

19               CMC executives and physicians during a Las Vegas Medical Conference.

20            d) In January of 2016, Defendant PNA paid for a trip to New York for Mr. Jason

21               Liao, a CPA with no official relationship to PNA, totaling $50,000.

22            e) In February of 2016, Defendant PNA paid for a trip to Spain for Mr. Scott Wells,

23               President of Defendant Santé Health and Defendant Santé Foundation, and Ms.

24               Joyce Fields-Keene, CEO of Central California Faculty Medical Group, totaling

25               $9,400.

26            f) In May of 2016, Defendant PNA made a donation to Defendant Santé

27               Foundation through Pacific Auction Co., totaling $16,617.20.

28

8

g) In June of 2016, Defendant PNA paid for a trip to Napa Valley, California, for Defendant Mr. Castro and Mr. Jason Liao totaling $20,200.

h) In June of 2016, Defendant PNA purchased hundreds of bottles of luxury wine for a CMC foundation fundraiser event totaling $53,400.

i) In September of 2016, Defendant PNA paid for a trip to Beverly Hills, California for Defendant Dr. Synn totaling $6,700.

j) In November of 2016, Defendant PNA paid for a trip to Nashville, Tennessee for CMC employees totaling $9,300.

k) In November of 2016, Defendant PNA paid for another trip to Las Vegas, Nevada for Mr. Jason Liao totaling $3,300.

l) In December of 2016, Defendant PNA purchased Christmas gifts for Defendants Mr. Joslin and Mr. Rafferty totaling $5,500.

m) In December of 2016, Defendant PNA purchased a trip to Las Vegas, Nevada, for Mr. Jason Liao totaling $9,200.

n) In December of 2016, Defendant PNA made a donation to Defendant CMC's foundation totaling $10,000.

o) In 2017, Defendant PNA purchased a trip to New York City, New York, as a door prize for Defendant CMC's Foundation fundraiser, totaling over $30,000.

p) In June of 2017, Defendant Mr. Roggenstein directed Defendant PNA to contribute $4,000 to a campaign fund for Senate Candidate Andres Borgeas at the request of Defendant CMC.

q) In July of 2017, Defendant Mr. Roggenstein purchased Christmas gifts for Defendants Mr. Castro and Mr. Joslin totaling $4,270.94. These gifts were expensed through Defendant PNA.

42.    In 2013, Defendant CCFMG entered into a 5-year contract with Defendant PNA to implement their network of physicians' and staff on Defendant CMC's Epic EHR network. The billing terms were extremely favorable and did not include any one-time license or implementation

9

1  fees, as well as extremely discounted fees for monthly maintence and support for enrolled

2  providers.

3      43.    Defendant CCFMG went "live" on the CMC Epic EHR network in around April of

4  2013. However, due to the construction of the contract, CCFMG did not begin paying on the

5  contract until sometime in 2015. And of the fees paid from 2015-2016, CCFMG only paid 50% of

6  the contracted amounts.

7      44.    In or around 2014, Defendant Mr. Roggenstein approached CMC about his plan to

8  relocate Defendant PNA's offices to a new office building. Defendant Mr. Roggenstein wanted to

9  relocate to a new building for PNA and another company that he was affiliated with, Forward

10  Advantage Inc. ("FAI"). Defendant CMC advised Mr. Roggenstein that rather than relocating the

11  offices, CMC would pay the costs to remodel PNA's headquarters (approximately 15,000 square

12  feet of commercial space).

13      45.    Defendant CMC contributed approximately $1.1 million to renovate Defendant

14  PNA's headquarters and constructed a state-of-the-art wine and cigar lounge referred to as "HQ2"

15  located at 7215 N First Street, Fresno, CA 93720. Defendant CMC even renovated Defendant Mr.

16  Roggenstein's company FAI's office space, which FAI only provided partial reimbursement for.

17      46.    HQ2 consists of a refrigerated wine room and high-end lounge for seating. The

18  lounge includes private humidor lockers for cigar storage, as well as a state-of-the-art smoke

19  ventilation system to expel cigar smoke. HQ2's wine room contained thousands of bottles of luxury

20  wines and liquors valued at approximately $750,000 to $1,200,000.

21      47.    Throughout the relevant time period, HQ2 has been used by Defendant CMC and

22  its executives to recruit medical groups and individual physicians to join their Epic EHR Network.

23  This use includes, among other things, private employee parties, CMC executive meetings with

24  physicians, and private use by Epic EHR Network physicians. Select CMC executives and

25  individual physicians in the CMC Epic Network were also given keys to the refrigerated wine room.

26      48.    Epic EHR Network physicians and managing partners of the network medical

27  groups were allowed to make reservations to HQ2 through Defendant PNA. A reservation included

28

table service, and free access to wine, liquor and food. All of the costs for these services were submitted to Defendant CMC as Defendant PNA expenses.

49.    In 2014, Defendant Santé Foundation began to work with CMC and PNA to bring more physicians and medical groups inside of the Epic EHR network. Once physicians joined Santé Foundation, the daily operations of each practice would then be managed by Defendant Santé Health. Because they were members of the Santé Foundation, physicians and medical groups did not have to pay for access or installation of Defendant CMC's Epic network (an approximate value of over $46,000 per 5-year contract and $10,000 worth of equipment).

50.    Defendant PNA would bill Defendant Santé Foundation for the one-time fees and monthly maintenance and support for Defendant CMC's Epic EHR network. Santé Foundation paid for their members' fees and maintenance bills using grants and other funding from Defendant CMC. Defendant PNA would then return some of the money, which had originated with CMC anyway, to CMC as "licensing fees". This system effectively removed any actual costs paid by the individual physicians or medical groups for access to CMC's Epic EHR system.

51.    From November 2013 to January 2017, Defendant Santé Foundation paid $5,661,796.06 in invoices to Defendant PNA for their members' access, installation, and maintenance of Defendant CMC's Epic EHR system. Santé Foundation received the money to pay these invoices directly from CMC in the form of grants and/or donations.

52.    Upon information and belief, Defendant Mr. Apkarian, while employed by Santé Health Foundation, hosted weekly recruiting meetings with physicians at HQ2. The purpose of these meetings was to recruit additional members to Defendant CMC's Epic EHR network. In one notable example, Mr. Apkarian was instrumental in recruiting a group of pediatricians from Valley Children's Hospital to join Santé Health Foundation, and ultimately, the Epic EHR system.

53.    In or around May of 2014, Defendant Mr. Roggenstein created an intellectual property interest by formally documenting the process of installing CMC's Epic EHR system to existing physician and medical group sites. To market this intellectual property, Mr. Roggenstein created PNA Methodologies LLC, whose sole asset was the intellectual property rights to the methods of installing CMC's Epic system.

11

54.  Defendant Mr. Roggenstein sold 40% of his membership interest in PNA Methodologies LLC to CMC executives Defendant Mr. Joslin, Defendant Mr. Rafferty, and Defendant Mr. Castro. Each member paid an initial installment of $15,000.

55.  To assess the revenue earning potential of the methodologies created by Defendant Mr. Roggenstein, Defendant PNA paid for market research from a third-party vendor. The vendor determined that there was no value to the property outside of the Fresno area because the methodology was unique to the process of installing the Epic EHR network which was Fresno based. After learning that their $15,000 investment was valueless, Defendants' sought and received reimbursement from Defendant PNA.

56.  Defendant PNA was reimbursed by Defendant CMC for all of the expenses associated with the formation of PNA Methodologies LLC, the market research study, and the repayment of the investments.

57.  Throughout the relevant time periods, Defendant PNA employed individuals at the sole request of Defendant CMC for little or no legitimate reason or purpose. These individuals included Epic EHR Network Physicians as well as family members of Defendant CMC Executives.

58.  For example, in or around September 2014, Defendant Dr. Maruyama suffered a medical condition and was no longer able to perform on-call duties for Defendant CMC's hospitals. In January 2015, Defendant PNA hired Dr. Maruyama as a "Physician Advisor" and paid Dr. Maruyama a salary of $185,000 per year. At no time did Dr. Maruyama perform any meaningful work for Defendant PNA.

59.  Defendant PNA also employed the following at the behest of Defendant CMC for participating in the CMC Epic EHR Network:

    a) The son of Defendant Mr. Castro;

    b) the son of Defendant Dr. Nakamura;

    c) the son of Dr. Ajit Arora, a Managing Physician of Fresno Gastroenterology and CMC Board Member; and

    d) the son of Defendant Mr. Rafferty.

60.    Defendant PNA has provided and continues to provide below fair-market value and, often, free marketing services to physicians and medical groups enrolled in the CMC Epic EHR System and as an incentive for new groups to join the system. In particular, Defendant PNA provided Community Medical Providers, the medical group directed by Defendant Dr. Nakamura, over 1500 hours of discounted services. Upon information and belief, Community Medical Providers has never paid Defendant PNA for these services.

61.    From as early as 2011, Defendant PNA began its annual wine give-away. Eligible participants included individual physicians as well as office managers that were members of Defendant CMC's Epic EHR Network. Approximately 300 bottles of wine were distributed every year.

62.    In March of 2017, a fire at Defendant PNA's headquarters led to the discovery of a storage room that housed approximately 40-50 boxes of wine, approximately 1000 bottles in total. Mr. Michael Terpening asked Defendant Mr. Roggenstein what the wine was for, and he was told it was "left over from the holiday party."

63.    Discovery of the wine surplus led Mr. Michael Terpening to become suspicious of other large expenditures that were submitted as deductible "business expenses" for PNA. Mr. Michael Terpening raised his concerns with Defendant Mr. Roggenstein who gave him access to limited records in an attempt to assuage his concerns. Instead, Mr. Michael Terpening began to unravel the above conduct and confronted Defendant Mr. Roggenstein about the illegality of that conduct.

64.    Mr. Michael Terpening asked Mr. Roggenstein to cease the illegal activity. Rather than heed Mr. Terpening's advice, Mr. Roggenstein redoubled his criminal efforts, continuing the existing misconduct and expanding into new areas. In September of 2017, Defendant Mr. Roggenstein entered into a land lease with Defendant CMC to begin developing a new project called "HQ Ranch". Once developed, HQ Ranch will be used exclusively as a retreat for Defendant CMC executives and Epic EHR Network physicians. Current plans for the land include: a cigar and wine lounge that is larger and grander in scale than HQ2, a skeet shooting range, and a small off-road vehicle course.

13

65.    Upon information and belief, Defendant CCFMG will be joining Defendant Santé Foundation in 2019, so that excess funding retained by Defendant PNA can be applied to Defendant CMC's project HQ Ranch.

66.    Once he realized that neither Defendant Mr. Roggenstein, Defendant PNA, nor Defendant CMC had any intention of remedying the above conduct, and in an effort to quit the illegal conspiracy, Mr. Terpening resigned from his position as a Controller for Defendant PNA.

67.    The above scheme is illustrated in the Illegal Kickback Scheme Diagram ("Illegal Kickback Diagram") below:



*The False Claims Act*

68.    The federal False Claims Act provides, in part, that any person who:

    a)  knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

    b)  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

14

1    c) conspires to defraud the Government by getting a false claim allowed or paid,

2    is liable to the United States Government for a civil penalty plus three times the amount of

3    damages which the Government sustains because of the act of that person.

4    69.    In order to submit claims to federal health care programs, the physician, medical

5    group, or hospital must certify, either expressly or impliedly, that said entity is in compliance with

6    the Anti-Kickback statute each time a claim is submitted.

7    70.    Because compliance with the Anti-Kickback Statute is a material condition of

8    payment under the federal Medicare and Medicaid programs, claims submitted knowingly in

9    violation of the Anti-Kickback statute constitute a "false or fraudulent" claim under the False

10   Claims Act. 31 U.S.C. § 3729.

*The Anti-Kickback Statute*

11

12   71.    The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1) and (2). makes it a

13   crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

14    a) to refer an individual to a person for the furnishing of any item or service covered

15        under a federal health care program; or

16    b) to purchase, lease, order, arrange for or recommend any good, facility, service,

17        or item covered under a federal health care program.

18   72.    The term "any remuneration" includes any kickback, bribe, or rebate, whether direct

19   or indirect, overt or covert, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(1).

20   73.    The federal Anti-Kickback Statute applies to any arrangement where even one

21   purpose of the remuneration was to prompt or reward referrals of services or to induce further

22   referrals of Medicare patients. *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989). Proof of an

23   agreement to refer business is not necessary to establish a violation of the Anti-Kickback statute.

24   74.    Actual knowledge or specific is not required of violations of the federal Anti-

25   Kickback Statute. 42 U.S.C. § 1320a-7b(h).

26   75.    Violations of the federal Anti-Kickback Statute constitute a felony punishable by a

27   maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the

28   federal Anti-Kickback Statute must be excluded from Federal health care programs for a term of at

15

1   least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a conviction, the Secretary of the

2   Department of Health and Human Services may exclude that provider and impose administrative

3   sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

4                                      *The Stark Law*

5           76.    The Stark Law, 42 U.S.C. § 1395nn(a)(1), prohibits a physician or medical provider

6   from referring Medicare patients for certain "Designated Health Services", to an entity with which

7   the physician or the physician's immediate family has a "financial relationship," unless an

8   exception applies. The Stark Law prohibits physician referrals to related entities for both inpatient

9   and outpatient hospital services.

10          77.    A "financial relationship" includes a direct or indirect ownership or investment

11  interest in the Designated Health Services, or a direct or indirect compensation arrangement

12  between the physician and the entity that furnishes the Designated Health Services. 42 C.F.R. §

13  411.354(a)(1).

14          78.    Compensation cannot be determined in any manner that takes into account directly

15  or indirectly the volume or value of any referrals made by the physician or medical group.

16  Compensation for the purposes of the Stark Law does not include payment if the employment is

17  for readily identifiable services or if it is consistent with the fair market value of the services

18  provided. 42 U.S.C. § 1395nn(e)(2).

19          79.    Further, the Stark Law prohibits health care entities from presenting or causing to

20  be presented any Medicare claim for Designated Health Services provided as a result of a prohibited

21  referral. 42 U.S.C. § 1395nn(a)(1)(B). Any entity that collects Medicare or Medicaid payments

22  pursuant to a prohibited referral must refund all collected amounts. 42 U.S.C. § 1395nn(g)(2).

23          80.    Violators of the Stark Law may be excluded from participation in federal health care

24  programs and be subject to various financial penalties, such as:

25                 a)  a civil monetary penalty of $15,000 for each service included in a claim for

26                     which the physician knew or should have known that payment should not have

27                     been made; and

28

                                              16

b) three times the amount claimed for a service rendered pursuant to a referral the physician knew or should have known was prohibited.

c) a civil monetary penalty of not more than $100,000 for any arrangement or scheme in which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity in violation. 42 U.S.C. § 1395nn(g).

## CLAIMS FOR RELIEF

### I.   FIRST CAUSE OF ACTION –
### VIOLATIONS OF THE FALSE CLAIMS ACT

(31 U.S.C. § 3729)

(Against All Defendants)

81.    Relator realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

82.    Before he filed this action, Relator served the Attorney General and United State Attorney with a written disclosure of substantially all material evidence and information then in Relator's possession.

83.    Defendant CMC has provided, and continues to provide, monetary and other tangible incentives to Fresno-area physicians and medical groups to induce improper referrals of services to Defendant CMC facilities in violation of the federal Anti-Kickback Statute.

84.    Defendant CMC and its executives conspired with Defendant Mr. Roggenstein to develop Defendant PNA to shelter the illegal kickback payments and elaborate gifts to Epic EHR Network physicians and medical groups in exchange for referrals to their facilities in violation of the Anti-Kickback Statute.

85.    Defendant Santé Health and Santé Foundation organized and conspired with Defendant CMC and Defendant PNA to cover all costs and fees associated with installing and

1  maintaining the Epic EHR system for physicians and medical groups in order to induce illegal

2  referrals to Defendant CMC's facilities in violation of the Anti-Kickback Statute.

3       86.    Defendant CCFMG conspired with Defendants PNA and CMC to receive the use

4  and benefit of the CMC Epic EHR network for little to no cost. Defendant CCFMG made countless

5  referrals to CMC in order to continue to have access and use of the Epic EHR system and network.

6       87.    All Defendants conspired with Defendant CMC by receiving compensation in the

7  form of cash, gifts, wine, travel, ownership interest in subsidiary companies for CMC executives,

8  and exclusive access to Defendant PNA's HQ2, as payment for patient referrals to Defendant

9  CMC's facilities through Defendant CMC's Epic EHR network.

10       88.    All Defendants conspired with Defendant CMC by receiving compensation in the

11  form of cash, gifts, wine, travel, ownership interest in subsidiary companies, and exclusive access

12  to Defendant PNA's HQ2, as payment for recruiting other physicians and medical groups to join

13  Defendant CMC's Epic EHR network.

14       89.    Defendants' violations of the federal Anti-Kickback Statute give rise to liability

15  under the federal False Claims Act.

16       90.    As a prerequisite to participating in federally-funded health care programs,

17  Defendants' expressly certified (or, through their participation in a federally funded programs,

18  impliedly certified) their compliance with the federal Anti-Kickback Statute.

19       91.    Defendants violated the federal False Claims Act by submitting claims for

20  reimbursement from federal health care programs, including Medicare and Medicaid, knowing that

21  they were ineligible for the payments demanded due to federal Anti-Kickback Statute violations

22  associated with illegal remuneration paid to physicians and medical groups within the Epic EHR

23  system.

24       92.    Every claim submitted by Defendants to a federally-funded health care program for

25  a service provided to a patient that was referred through the Epic EHR system is false because they

26  are tainted referrals due to the illegal remuneration paid to physicians and medical groups for

27  joining the network.

28

93.     The United States, unaware of the falsity of these claims made by the Defendants, and in reliance on the accuracy thereof, paid money to the Defendants for the fraudulent claims.

94.     The United States, the Fresno community and the general public have been damaged as a result of the Defendants violations of the False Claims Act in an amount to be determined at trial.

## II.  SECOND CAUSE OF ACTION –
## VIOLATIONS OF THE ANTI-KICKBACK STATUTE

(42 U.S.C. § 1320a-7b(b))

(Against All Defendants)

95.     Relator realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

96.     Defendant CMC has provided and continues to provide monetary incentives to Fresno-area physicians and medical groups to induce improper referrals of services to Defendant CMC facilities in violation of the federal Anti-Kickback Statute.

97.     Defendant CMC and Defendants Mr. Joslin and Mr. Castro conspired with Defendant Mr. Roggenstein to develop Defendant PNA. Defendant PNA operates as a department of Defendant CMC disguised as a separate corporation in order to shelter the illegal kickback payments and elaborate gifts to Epic EHR Network Physicians and medical groups in exchange for referrals to their facilities.

98.     Defendant CMC paid all capital contributions to develop Defendant PNA and continued to pay for improvements to Defendant PNA's facilities including the development of HQ2, the luxury wine and cigar lounge for Defendant CMC's executives and select physicians and members of Defendant CMC's Epic EHR network.

99.     Throughout all relevant time periods, Defendant CMC reimbursed all costs and expenses of Defendant PNA. These costs and expenses included thousands of dollars of extravagant

1　gifts, wine, entertainment such as strip clubs, and domestic and international trips for Defendant

2　CMC executives, Epic EHR Network Physicians and owners of medical groups to induce

3　membership in the Epic EHR Network.

4　　　100.　Defendants Santé Health and Santé Foundation conspired with Defendant CMC and

5　Defendant PNA to provide free hardware and licensing of the Epic EHR system in order to induce

6　Fresno-area physicians and medical groups to join the system. Santé Health and Santé Foundation

7　covered these costs with funds received directly from Defendant CMC through grants and

8　donations.

9　　　101.　Defendant CMC instructed Defendant PNA to employ Defendant Dr. Maruyama

10　and family members of Defendant Mr. Castro, Dr. Nakamura, and Mr. Rafferty to provide

11　compensation in exchange for patient referrals to CMC facilities through expansion of the Epic

12　EHR network.

13　　　102.　Defendant Mr. Joslin knew of and authorized the payments and expenses

14　reimbursed to Defendant PNA for the purchases and giveaways of expensive gifts and travel on

15　behalf of CMC. Defendant Mr. Joslin also knew of and authorized the purchase and construction

16　of HQ2 and its subsequent use to induce physicians and medical providers to join the Epic EHR

17　network.

18　　　103.　The purpose of this elaborate scheme was to induce Fresno-area physicians and

19　medical groups to become members of Defendant CMC's Epic EHR network. Once a physician or

20　medical group became a member of the Epic EHR Network, their patients would be referred to the

21　inpatient and outpatient facilities within the network. Because it is a closed network, all of the

22　patients were referred to Defendant CMC facilities.

23　　　104.　All of the Defendants knowingly and willfully accepted these remunerations in

24　exchange for their continued membership in the Epic EHR system and their continued referrals to

25　Defendant CMC facilities.

26　　　105.　Defendants' unlawful scheme to acquire future patient referrals by paying

27　"kickbacks," violated 42 U.S.C. § 1320a-7a resulting in damages sustained by the federal

28　government in an amount to be determined at trial.

20

III. THIRD CAUSE OF ACTION –

VIOLATIONS OF STARK LAW

(42 U.S.C. § 1395nn)

(Against All Defendants)

106.    Relator realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

107.    Defendant CMC has knowingly and willingly offered and paid remuneration directly and indirectly, through Defendant PNA, to Fresno-area physicians and medical groups in violation of 42 U.S.C. § 1395nn.

108.    Defendant CMC directly controlled and approved all expenses and transactions of Defendant PNA and reimbursed Defendant PNA for any and all costs incurred for the recruitment of physicians and medical practices to the Epic EHR Network.

109.    Epic EHR Network Physicians had a financial relationship with Defendant CMC, Defendant PNA, Defendant Santé Health and Defendant Santé Foundation to which the Stark Law applied, namely, the illegal and excessive remuneration that Defendant CMC paid to the network's members.

110.    Defendant CMC paid for all costs and fees associated with the installation and maintenance of the Epic EHR system as incentive to join the network. Before Defendants Santé Health and Santé Foundation entered into the scheme, Defendant PNA contracted directly with individual physician practices for the Epic EHR system, which allowed for some physicians (but not all) to contribute a portion of the costs for the technology and software as required by the Stark Law.

111.    To provide Fresno practices and physicians with completely free use of the Epic EHR system and software, Defendant CMC joined with Defendants Santé Health and Santé Foundation. Defendant CMC provided Santé Health and Santé Foundation with grants of up to $56,000 per physician for Epic EHR one-time implementation and Epic license fees, monthly maintenance and support fees, as well as an addition $10,000 to cover the hardware costs of the

21

1   Epic EHR network. Some of this grant money was then returned to Defendant CMC in the form of

2   "licensing fees" through Defendant PNA.

3       112.   As a result of the elaborate money transferring scheme, the costs of the software and

4   equipment, as well as, the use of the Epic EHR system are not passed through to individual

5   physicians and medical practices. Thus, physicians in the Epic EHR network do not contribute the

6   required 15% share of costs as required under the Stark Law. Further, Physicians and medical

7   practices received the hardware for the systems completely free, even though hardware is an

8   express cost that is not eligible for any subsidies.

9       113.   Several physician members of the Epic EHR Network were invited to serve on an

10   "advisory board" by Defendant CMC. These physicians were paid $1,000 year and $150 per hour

11   for meetings hosted by Defendant PNA. Defendant PNA was then reimbursed by Defendant CMC

12   for this compensation.

13       114.   Defendant CMC executives made a pledge of thousands of dollars at a local

14   fundraising event hosted by different physicians and medical groups, some of which were already

15   within the Epic EHR network and some of which were being invited to join. Defendant PNA

16   reimbursed the Defendant CMC executives in cash for the amount that each executive pledged.

17       115.   Defendant PNA provided Defendant Dr. Nakamura free and/or below-fair-market

18   value marketing services for his company, Community Medical Providers. In exchange for Epic

19   EHR Network referrals, Defendant PNA employees recorded a total of over 1500 hours of

20   marketing work. As of December 2017, neither Defendant Dr. Nakamura nor Community Medical

21   Providers paid PNA for these services, valued at approximately $60,000.

22       116.   Defendant CMC provided all of the capital for Defendant PNA's construction of

23   HQ2, the wine and cigar lounge that was used to entice physicians and medical providers to join

24   the Epic EHR Network. Defendant PNA purchased hundreds of thousands of dollars of wine and

25   liquor to stock HQ2 and provided select physicians and CMC executives, Defendants' Mr. Joslin,

26   Mr. Roggenstein, Mr. Castro, Mr. Rafferty and others with free access to this stockpile. Defendant

27   CMC reimbursed Defendant PNA for these purchases.

28

117.   Defendant PNA provided an annual Christmas give away of over 300 bottles of wine (valued in excess of the allowable amount under the Stark Law) to physicians and practices within the Epic EHR network.

118.   Defendant PNA purchased thousands of dollars in extravagant gifts and travel for the benefit of CMC executives and Physicians.

119.   All expenses incurred by Defendant PNA paid to Physicians and medical providers to induce referrals to Defendant CMC's Epic EHR network, were reimbursed by Defendant CMC.

120.   Defendant Mr. Roggenstein, on behalf of Defendant PNA, personally leased property directly from Defendant CMC to construct HQ Ranch, a luxury retreat for CMC Executives and Physicians and practices. Upon information and belief, Defendant CCFMG, who is already on the Epic EHR network is in the process of joining Defendant Santé Foundation. Excess funds generated from this partnership will then be paid to Defendant PNA who will use the funds to pay for the development of the land.

121.   None of the Defendants have recorded or disclosed any of the remunerations received by Defendant CMC, yet all of the Defendants have referred and continue to refer patients to Defendant CMC facilities through the Epic EHR system.

122.   Defendants' payments to individual physicians and medical practices constitute a financial relationship under 42 U.S.C. § 1395nn(a) and (h)(1).

123.   Defendants' continuous referrals of patients to Defendant CMC, an entity with which they had a financial relationship, violates the Stark Law. None of the Stark Law's exceptions apply to the illegal financial relationships or referrals between Defendants and Defendant CMC.

124.   Defendants' unlawful scheme to acquire future patient referrals by providing compensation, elaborate gifts, free software and hardware, and fully funded trips across the world, constituted an illegal compensation arrangement in violation of 42 U.S.C. § 1320a-7a resulting in damages sustained by the federal government in an amount to be determined at trial.

//

//

//

### IV.  FOURTH CAUSE OF ACTION –

### INJUCTIVE AND DECLARATORY RELIEF

125.   Relator realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

126.   There exists an actual controversy between the federal government and the Defendants regarding the Defendants kickback and remuneration scheme.

127.   Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Relator in good faith requests the following equitable relief

    a)  that a judicial determination and declaration be made of the rights of the federal government and the corresponding responsibilities of Defendants;

    b)  that Defendants be ordered to cease their unlawful practice of providing payments or payments in kind to physicians and medical practices in an effort to induce them to join the Epic EHR Network; and

    c)  that any further equitable relief that this Court deems just be afforded to the federal government.

### **PRAYER FOR RELIEF**

**WHEREFORE,** Relator Mr. Michael Terpening prays for judgment against Defendants and for relief as follows:

1.   for damages and civil penalties as allowed under the federal False Claims Act, the Anti-Kickback Statute, the Stark Law and the California False Claims Act;

2.   for treble damages as allowed under the federal and state False Claims Act;

3.   for the maximum Relator award allowed under both the federal and state False Claims Act, and under any other statute;

4.   for expenses, attorneys' fees and costs pursuant to 31 U.S.C. § 3730, the State FCAs, and any other statute allowing for attorneys' fees;

5.   for interest;

6.   for declaratory and injunctive relief; and

7.   award such other and further relief as this Court may deem appropriate.

1        8.      Plaintiff hereby demands a trial by jury.

2

3    This 4th day of December, 2019.

4                                                    /s/ William R. Terpening
                                                    William R. Terpening
5                                                    NC Bar 36418
                                                    *Pro Hac Vice* Admission Pending
6

7    **TERPENING LAW PLLC**
     5950 Fairview Road, Suite 808
8    Charlotte, North Carolina 28210
     terpening@terpeninglaw.com
9    (980) 265-1700

10                                                  *Counsel for Qui Tam Plaintiff Michael
                                                    Terpening.*
11

12

13                                                  /s/ Jeffrey S. Mitchell
                                                    Jeffrey S. Mitchell
14

15   **MITCHELL LEEDS, LLP**
     555 California Street, Suite 4925
16   San Francisco, CA 94104
     jeff@mitchelllawsf.com
17   (415) 659-1555

18                                                  *Local Counsel for Qui Tam Plaintiff Michael
                                                    Terpening.*
19

20

21

22

23

24

25

26

27

28